IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | Civil No. 4:23-CV-167 |
| Plaintiff. ) | |
| ) | |
| v. ) | VERIFIED COMPLAINT FOR |
| ) | FORFEITURE *IN REM* |
| Property Generally Described ) | |
| As 3619 Amherst Street, ) | |
| Des Moines, Iowa ) | |
| ) | |
| Defendant. ) | |

Plaintiff, United States of America hereby files and serves this VERIFIED COMPLAINT IN REM and alleges as follows:

## I. NATURE OF THE ACTION

1. This is an action to forfeit and condemn specific property to the use and benefit of the United States of America ("Plaintiff") due to its involvement in violations of 21 U.S.C. § 846 (attempt and conspiracy), § 841(a)(1) (prohibited acts), and § 856 (maintaining drug-involved premises).

2. The United States believes the Defendant real property was used, or intended to be used, to facilitate one or more controlled substance offenses under Subchapter I, Title 21, United States Code, and is therefore forfeitable under 21 U.S.C. § 881(a)(7).

## II. DEFENDANT *IN REM*

3. The Defendant property is generally described as:

> 3619 Amherst Street, Des Moines, Iowa, or
>
> Lot 17 in Block 8 in Plat 1 of Auburn Heights, an Official Plat, now included in and forming a party of the City of Des Moines, Polk County, Iowa;

(hereinafter "Defendant Real Property").

4. The Defendant Real Property is located in the Southern District of Iowa.

## III. JURISDICTION, VENUE, AND PROCEDURAL AUTHORITY

5. This Court has jurisdiction over an action commenced by the United States as Plaintiff, pursuant to 28 U.S.C. § 1345.

6. This Court has original jurisdiction over this action for the recovery or enforcement of a fine, penalty, or forfeiture incurred under an Act of Congress, pursuant to 28 U.S.C. § 1355(a).

7. This Court also has jurisdiction over this action because acts or omissions giving rise to this civil forfeiture occurred in the Southern District of Iowa, therefore, this action may be brought in this District, pursuant to 28 U.S.C. § 1355(b)(1)(A).

8. Venue is proper in this District because this is a civil proceeding for the recovery of a pecuniary fine, penalty, or forfeiture, and is being prosecuted in the district where the action occurred, as authorized by 28 U.S.C. § 1395(a).

9. Venue is also generally proper in this District under 28 U.S.C. § 1391(b)(2) because it is where "a substantial part of the events or omissions giving

rise to the claim occurred, or a substantial part of the property that is the subject of the action is situated."

10. The general rules for civil forfeiture proceedings are set forth in 18 U.S.C. § 983.

11. Section 985 of Title 18, United States Code (Civil forfeiture of real property) is applicable to this matter.

## IV. FACTS

12. The "Controlled Substances Act" was enacted by Congress as Title II of the "Comprehensive Drug Abuse Prevention and Control Act of 1970," Pub.L. No. 91-513, 84 Stat. 1236 (1970) (codified at 21 U.S.C. §§ 801-904).

13. The term "controlled substance" is defined in 21 U.S.C. § 802(6) to mean a drug or other substance, or immediate precursor, included in any of the five schedules of such substances set forth in subchapter I of Title 21.

14. Schedule II controlled substances have a high potential for abuse, and the drugs or substances have a currently accepted medical use in treatment in the United States or a currently accepted medical use with severe restrictions. Abuse of a Schedule II controlled substance may lead to severe psychological or physical dependence. 21 U.S.C. § 812(b)(2)(A) – (C). Schedule II controlled substances include methamphetamine. 21 U.S.C. § 812(b), Schedule II.

15. Under the Controlled Substances Act, it is unlawful to distribute, dispense, or possess with intent to distribute a controlled substance unless authorized by law to do so. 21 U.S.C. § 841(a)(1).

16.     Under the Controlled Substances Act, it is unlawful to use or maintain a place permanently or temporarily for the purpose of distributing a controlled substance, and to manage or control any place, permanently or temporarily, as owner or occupant and knowingly and intentionally make it available for use, with or without compensation, as a place for unlawfully storing or distributing a controlled substance. 21 U.S.C. § 856.

17.     Under the Controlled Substances Act, it is unlawful to conspire with others to violate its prohibitions. 21 U.S.C. § 846.

18.     It is believed or will be after a reasonable opportunity for further investigation and discovery, that evidence will show the Defendant Real Property was used, or intended to be used, to facilitate one or more controlled substance offenses in violation of federal law.

19.     This civil forfeiture is based on the involvement of the Defendant Real Property to facilitate a conspiracy to distribute methamphetamine, and other offenses under applicable provisions of the Controlled Substances Act.

20.     On April 20, 2023, Angel Donato Montoya (hereinafter "MONTOYA"), Jesus Javier Morales Murillo (hereinafter "MORALES MURILLO"), Emiliano Nava Munoz (hereinafter "E. NAVA MUNOZ"), Valentin Nava Munoz (hereinafter "V. NAVA MUNOZ"), Armando Garnica Aguilera (hereinafter "AGUILERA"), and Ashely Chacon (hereinafter "CHACON") were charged in a superseding indictment in the U.S. District Court for the Southern District of Iowa in case number 4:23-cr-064 with conspiracy to distribute methamphetamine from a date unknown, but having started

by at least July 2022 and continuing until March 30, 2023. The superseding indictment also included charges of distribution of a controlled substance and possession with the intent to distribute charges.

21. For purposes of this Verified Complaint, the foregoing Defendants and others working with them to illegally distribute methamphetamine are collectively referred to as "members of the conspiracy."

22. Drug traffickers often use various locations to serve different functions so that customers, thieves, and law enforcement personnel do not learn where they store large quantities of controlled substances, illegal drug proceeds, and/or other drug-related assets, and often do so in hope of protecting their safety and their drugs, money, and other assets from theft, detection, and seizure. The locations drug dealers use to store controlled substances, narcotics proceeds, and/or drug-related assets, are commonly known as "stash houses."

23. The Defendant Real Property was, at times relevant to this cause of action, a "stash house" for the conspiracy to distribute methamphetamine, where drugs were stored and then taken for distribution.

24. Persons involved in drug trafficking may also conceal caches of drugs, drug paraphernalia, and items of value and/or proceeds of drug transactions and evidence, as well as documents and other evidence of financial transactions relating to obtaining, transferring, secreting or spending large sums of money acquired from drug trafficking activities, in various locations, including, but not limited to, "stash houses", their residences, garages and outbuildings, businesses, and conveyances, as

well as those of other members of their organization.

25. When drug traffickers amass large quantities of cash from the sale of drugs, some often attempt to provide the money with a veneer of legitimacy by running the money through banks and financial institutions and their attendant services that include accounts, securities, traveler's checks, cashier's checks, money orders, wire transfers, stock certificates, bonds, certificates of deposit and safety deposit boxes. Other drug traffickers, concerned about being detected by law enforcement if they make "suspicious" cash deposits, hide their drug proceeds at what they believe to be safe locations, such as "stash houses", or they perhaps conceal the drug proceeds in hidden compartments located in residences or vehicles.

26. The Defendant Real Property was, at times relevant to this cause of action, a "stash house" for a conspiracy to distribute methamphetamine, where members of the conspiracy stored some of their cash profits or proceeds from the illegal sale of controlled substances.

27. Drug traffickers often maintain drugs, money ledgers, drug supplier lists, correspondence, notations, logs, receipts, journals, books, records, and other documents noting the price, quantity, and/or times when drugs they are illegally distributing have been obtained, transferred, sold, distributed, and/or concealed at various locations, including but not limited to their "stash houses", residences, garages and outbuildings, businesses, and conveyances.

28. Drug traffickers may also maintain and use drug paraphernalia such as "cutting" materials, manufacturing paraphernalia, weighing devices, miscellaneous

containers, packaging materials, and measuring devices which are used to facilitate the production and distribution of narcotics at various locations, including but not limited to their "stash houses", residences, garages and outbuildings, businesses, and conveyances.

29. Drug traffickers often place assets in names of relatives and close friends to avoid detection, seizure, and forfeiture of those assets by law enforcement agencies. Even though these assets are in other person's names, the drug traffickers retain records, documents, and deeds reflecting the purchase and/or upkeep of those assets while continuing to use those assets and exercise dominion and control over them.

30. The Defendant Real Property was placed in the name of its owner by a member of the drug conspiracy to keep knowledge of its true ownership from law enforcement and others.

31. Drug traffickers often travel to their purchase and distribution areas to facilitate their trafficking. After purchasing drugs, drug traffickers will transport or cause to be transported the drugs to locations in which they will convert and/or distribute the drugs. Methods of transportation include commercial airlines, private airplanes, trains, buses, rental and private automobiles, and government and contract mail carriers. Drug traffickers often use members of their organization to rent vehicles for the organization to use as transport vehicles and/or vehicles for the trafficker to drive so as not to be seen in expensive vehicles or known vehicles.

32. Members of the drug conspiracy transported, and attempted to

transport, methamphetamine to Des Moines in automobiles.

33. Drug traffickers often carry on their person, or maintain in their "stash houses", residences, garages and outbuildings, businesses, and conveyances, firearms, or other dangerous weapons to deter customers, thieves, and law enforcement personnel from stealing or seizing their drugs and narcotics proceeds.

34. MONTOYA, MORALES MURILLO, E. NAVA MUNOZ, V, NAVA MUNOZ, AGUILERA, and CHACON did, in fact, conspire, from a date unknown, but having started by at least July 2022 and continuing until March 30, 2023, to illegally distribute methamphetamine in the Southern District of Iowa.

35. During the time frame of the events in this case, MONTOYA, MORALES MURILLO, E. NAVA MUNOZ, V, NAVA MUNOZ, AGUILERA, and CHACON were not authorized by law to distribute, or possess with the intent to distribute, controlled substances.

36. Activities that the conspirators took included, but are not limited to, those cited herein.

37. From July 2022 through September 1, 2022, a confidential source purchased methamphetamine from MORALES MURILLO on multiple occasions.

38. During a controlled purchase on September 1, 2022, MORALES MURILLO introduced this confidential informant to MONTOYA for the purposes of purchasing methamphetamine.

39. Thereafter, the confidential informant began to purchase methamphetamine from MONTOYA, another member of the conspiracy.

40. In December 2022, CHACON was transporting methamphetamine as part of her involvement with the conspiracy.

41. On December 4, 2022, CHACON was stopped in Council Bluffs, Iowa with a 142-pound load of methamphetamine intended for MONTOYA.

42. On December 27, 2022, MURILLO introduced the confidential informant to other members of the conspiracy, E. NAVA MUNOZ, and V. NAVA MUNOZ for the purpose of purchasing methamphetamine.

43. From December 27, 2022, through March 30, 2023, the confidential informant purchased methamphetamine from E. NAVA MUNOZ and V. NAVA MUNOZ.

44. An undercover officer also purchased methamphetamine from E. NAVA MUNOZ and V. NAVA MUNOZ.

45. Evidence that members of the conspiracy were using the Defendant Real Property as a stash house includes that fact that before several of the sales of methamphetamine known to law enforcement, members of the conspiracy would leave their own homes, travel to the Defendant Real Property, and then leave and conduct the methamphetamine sale.

46. The evidence supports the conclusion that members of the conspiracy were, prior to methamphetamine sales, retrieving methamphetamine from the stash house, which was the Defendant Real Property.

47. On March 30, 2023, law enforcement executed several search warrants at the real properties associated with members and customers of the conspiracy,

including the Defendant Real Property.

48. When law enforcement executed the search warrant on the Defendant Real Property, they discovered unpackaged/loose methamphetamine in plain view, namely 1229.3 grams methamphetamine, located on a card table in the basement living room area.

49. During the search, law enforcement also discovered 128.8 grams methamphetamine in a glass jar (liquid meth), located on the bottom stair in the basement.

50. During the search, law enforcement also discovered 2620 grams of methamphetamine, located in a suitcase in the garage within nine packages.

51. No one was present at the Defendant Real Property at the time the search warrant was executed. There were no vehicles present at the property or in the garage.

52. No one appeared to be living at the Defendant Real Property. Most rooms were sparsely furnished or empty.

53. Mail was located at the residence, which included mail addressed to V. NAVA MUNOZ, MORALES MURILLO, Christian Gonzalez, and Matthew Stevens, among others, at the Defendant Real Property.

54. One bill from the Des Moines Water Works was addressed to MORALES MURILLO and showed a balance of due of $357.70 with a due date in July 2022 and was captioned "Service Termination Notice" Another bill from the Des Moines Water Works showed a balance of $57.69 due in October 2022, with a payment received of

$359.40. MidAmerican Energy Bills addressed to MORALES MURILLO at the Defendant Real Property were also located. A notice captioned "Disconnect Notice" showed a balance of $653.63 due by June 23, 2022.

55. The record owner of 3619 Amherst, Des Moines, Iowa is Christian J. Gonzalez (hereinafter "GONZALEZ").

56. GONZALEZ told law enforcement that his cousin, E. NAVA MUNOZ asked him to put the Defendant Real Property, which was then owned by E. NAVA MUNOZ, into GONZALEZ's name.

57. GONZALEZ agreed to let his name be used.

58. E. NAVA MUNOZ was not, however, the owner of the Defendant Real Property at that time. The property was owned by another member of the conspiracy, MORALES MURILLO.

59. The evidence suggests MORALES MURILLO and GONZALEZ engaged in this transaction at the direction of E. NAVA MUNOZ, who was the true owner of the Defendant Real Property, and asked MORALES MURILLO and GONZALEZ, at various times, to keep it in their names so he could distance himself from the property, and eventually put ownership of the Defendant Real Property in the name of someone not deeply involved in the conspiracy, namely GONZALEZ.

60. On or about April 29, 2021, Cristian J. GONZALEZ was given a QUIT CLAIM DEED to the Defendant Real Property by MORALES MURILLO.

61. On or about February 5, 2021, MORALES MURILLO was given a QUIT CLAIM DEED to the Defendant Real Property by Mathew A. Stevens, who had

previously been given a WARRANTY DEED to the Defendant Real Property.

62. GONZALEZ added he did not have anything to do with the purchase of the Defendant Real Property and was not paid for letting his name be put on the deed to the Defendant Real Property.

63. E. NAVA MUNOZ was arrested on federal drug charges in March 2023 and has been in custody since then.

64. On approximately May 10, 2023, law enforcement attempted to contact the resident of the Defendant Real Property.

65. When law enforcement went to the Defendant Real Property on May 10, 2023, the grass had grown to approximately 10 to 12 inches tall consistent with the property still being unoccupied.

66. GONZALEZ gave law enforcement verbal consent to enter and search the residence on May 10, 2023.

67. Law enforcement entered the Defendant Real Property and found no one present.

68. It appears the Defendant Real Property was abandoned after the search warrant was executed.

### V. COUNT ONE
### (FORFEITURE UNDER 21 U.S.C. § 881(a)(7))

69. Plaintiff repeats and realleges each and every allegation set forth above.

70. The government believes that evidence to be obtained and the facts pled above will prove, by a preponderance of the evidence, that the Defendant Real Property (3619 Amherst Street, Des Moines, Iowa) is a real property that was used,

and intended to be used, in any manner or part, to commit, or facilitate the commission of a violation of subchapter of Title 21, United States Code, that is punishable by more than one year's imprisonment.

71. As a result of the foregoing, the Defendant Real Property is liable to condemnation and to forfeiture to the United States for its use, in accordance with 21 U.S.C. § 881(a)(7).

## CLAIM FOR RELIEF

WHEREFORE, the United States prays that the Defendant property be forfeited to the United States and that it be awarded its costs and disbursements in this action and for such other and further relief as the Court deems proper and just.

Respectfully Submitted,

Richard D. Westphal
United States Attorney

By: /s/ Craig Peyton Gaumer
Craig Peyton Gaumer
Assistant United States Attorney
U. S. Courthouse Annex, Suite 286
110 East Court Avenue
Des Moines, Iowa 50309
Tel: (515) 473-9300
Fax: (515) 473-9292
Email: craig.gaumer@usdoj.gov

## VERIFICATION

I, J. Curtis Hale hereby verify and declare under penalty of perjury that I am a Special Agent with U.S. Drug Enforcement Administration, and that I have read the foregoing Verified Complaint and know the contents thereof and the matters contained in the Verified Complaint are true to my own knowledge, except for those matters not within my own personal knowledge and as to those matters, I believe them to be true.

The sources of my knowledge and information and the grounds for my belief are the official files and records of the United States and other law enforcement agencies working in this matter, including information provided to me by other law enforcement officers, as well as my investigation of this case, together with others, as a Special Agent with the U.S. Drug Enforcement Administration.

Dated: May 24, 2023.

_____
J. Curtis Hale, Special Agent
U.S. Drug Enforcement Administration